IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

DONNA O. EPPS,                          *

     Plaintiff,                      *

vs.                                     *          CASE NO. 3:05-CV-68 (CDL)

LOUISE WATSON, as Tax                   *
Commissioner of Madison County
and Individually, and MADISON           *
COUNTY, GEORGIA,
                                        *
     Defendants.
                                        *
_____        *

O R D E R

    This action arises from Plaintiff's termination from her position as a clerk in the Madison County, Georgia Tax Commissioner's Office.  Plaintiff contends that Defendant Watson, the Tax Commissioner, fired Plaintiff because she supported the Commissioner's opponent in the Commissioner's bid for reelection. Plaintiff maintains that the Commissioner's action violated her First Amendment rights.  Plaintiff also asserts a claim for violation of her due process rights because she received no termination hearing. Finally, Plaintiff makes a claim for age discrimination.

    Presently pending before the Court is Defendants' Motion for Summary Judgment (Doc. 55).  The Court held a hearing on this motion on October 21, 2008.  As discussed below, the Motion for Summary Judgment is granted as to all of Plaintiff's claims against the County, as well as Plaintiff's procedural due process claim and Age Discrimination in Employment Act claim against Defendant Watson.

Summary judgment is denied as to Plaintiff's First Amendment claims against Watson. Also before the Court is Defendant Watson's Motion to Strike (Doc. 73), which is granted for the reasons set forth below.

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A central purpose of the summary judgment rule is "to isolate and dispose of factually unsupported claims or defenses[.]" *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

The party moving for summary judgment has the burden to show that there is no genuine issue of material fact. *See id.* at 323. To meet this burden, the movant may point the court to "affirmative evidence demonstrating that the non-moving party will be unable to prove its case at trial." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993) (internal quotation marks and citations omitted). In the alternative, Defendant may show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325. This is because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.

Once the summary judgment movant meets its burden, the burden shifts and the nonmoving party must produce evidence to show that there *is* a genuine issue of material fact. *See Celotex Corp.*, 477 U.S. at 324. The nonmoving party "must go beyond the pleadings," *id.,* and point the Court to "specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *accord Celotex Corp.*, 477 U.S. at 324. The nonmoving party is not required to produce evidence in a form that would be admissible at trial, but it must point to some evidence to show a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 324. Such evidence may be in the form of affidavits, depositions, answers to interrogatories or admissions on file. *Id.*; *accord* Fed. R. Civ. P. 56(e).

The movant is entitled to summary judgment if, after construing the evidence in the light most favorable to the nonmoving party and drawing all justifiable inferences in favor of the nonmoving party, no genuine issues of material fact remain to be tried. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). It is not enough to have *some* alleged factual dispute; there must be a genuine issue of material fact to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 247-48. A fact is *material* if it is relevant or necessary to the outcome of the suit. *Anderson*, 477 U.S. at 248. A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party—there must be more than "some metaphysical doubt as to the material facts."

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Anderson*, 477 U.S. at 248.

MOTION TO STRIKE

Before the Court recites the facts as viewed in the light most favorable to Plaintiff, the Court must determine whether certain affidavits produced by Plaintiff may be considered.  Watson asks the Court to strike the affidavits of the following individuals, which were submitted by Plaintiff in opposition to Defendants' motion for summary judgment: Adrienne Simmons, Lane Fitzpatrick, Mike Porterfield, Rita J. Wammock, Philip M. Prince, John G. Bellew, Joan Bartlett, Michael Haley, and Peggie E. Davis.  Although Defendants' counsel became aware that Plaintiff's counsel sought to have Lane Fitzpatrick complete an affidavit shortly before discovery closed on May 27, 2008, Plaintiff has not shown the Court that she properly identified Lane Fitzpatrick or any other witness by supplementing her initial disclosures or interrogatory responses prior to the close of discovery.[1]  Plaintiff contends that the affidavits are permissible because the parties stipulated in their Scheduling/Discovery Order that "John or Jane Doe" witnesses would be deposed.  Such a stipulation does not, however, excuse Plaintiff from disclosing the identities of the witnesses once they are known.  Because Plaintiff has not shown that she properly disclosed the witnesses to Defendants

---

[1]Plaintiff contends that she "notified and supplemented her responses to the interrogatories," but she does not offer any evidence that she identified the witnesses at issue in Watson's Motion to Strike.

4

during discovery, the Court grants Watson's Motion to Strike (Doc. 73) and will not consider the affidavits in ruling on Defendants' Motion for Summary Judgment.

Plaintiff contends that Watson produced affidavits from witnesses who were not disclosed to Plaintiff until after the close of discovery. However, Watson supplemented her answers to Plaintiff's interrogatories prior to the close of discovery and identified every witness Plaintiff now contends was identified too late. (Ex. 2 to Pl.'s Resp. in Opp'n to Def.'s Mot. to Strike.) Therefore, the Court cannot find that the witnesses were disclosed after the close of discovery, so to the extent Plaintiff seeks to strike the affidavits submitted by Watson on that basis the Court declines to do so.

FACTUAL BACKGROUND

Viewed in the light most favorable to Plaintiff, the record reveals the following:

**I.   The Defendants**

Defendant Watson is the Tax Commissioner of Madison County. The Tax Commissioner's office is not a division of Madison County or its governing authority—it is a separate office. Ga. Const. art. IX § I ¶ III; Ga. Const. art. IX § II ¶ I(c)(1) ("The power granted to counties . . . shall not be construed to extend to . . . [a]ction affecting any county elective office . . . or the personnel thereof . . . .")

5

## II.  Plaintiff's Employer

Plaintiff was employed as a clerk in the Madison County
Tax Commissioner's Office ("TCO") from January 5, 1981 to
November 3, 2004.  Defendants contend that Plaintiff was an
employee of the Madison County Tax Commissioner's Office, but
Plaintiff contends that she was an employee of Madison
County.[2]  Plaintiff cannot dispute that the TCO is a separate
entity from Madison County.  Ga. Const. art. IX § I ¶ III;
Ga. Const. art. IX § II ¶ I(c)(1).  Plaintiff does not
seriously dispute that only the Tax Commissioner had authority
to hire and fire employees in the TCO.[3]  Plaintiff admits
that she was hired to work in the TCO by former Tax
Commissioner Loutrelle Hutchins.  (Pl.'s Aff. ¶ 15, June 26,
2008.)  Plaintiff does not dispute that Watson was her direct
supervisor, and she does not dispute that Watson was
responsible for developing policies and making assignments
within the TCO.

In support of her argument that she was a county
employee, Plaintiff shows that her Separation Notice lists
"Madison County Board of Commissioners" as her employer.
(Ex. 13 to Pl.'s Resp. to Defs.' Mot. for Summ. J [hereinafter
Pl.'s Resp.])  Standing alone,

---

[2]The Court notes that in her Charge of Discrimination to the Equal
Employment Opportunity Commission ("EEOC"), Plaintiff listed "Madison
County Tax Commissioner" as her employer.  (Ex. A to Pl.'s Mot. for Leave
to File Am. Compl.)

[3]At the hearing on the Motion for Summary Judgment, Plaintiff's
counsel did point out that the TCO is funded by the County and that the
County could deny funding for a position, but Plaintiff has not pointed
to any evidence that the County had any authority over which individuals
Watson could hire or fire.

this single document is not sufficient to establish that the County was Plaintiff's employer.  Plaintiff also asserts that she should be considered a County employee because her paychecks came from the County, not the TCO.  (Pl.'s Dep. 101:21, Feb. 20, 2008.)  However, Plaintiff has pointed to no evidence that the Madison County commissioners hired TCO clerks in furtherance of the administration of the county.  Furthermore, under Georgia law, salaries and expenses for the operation of county tax commissioners are paid from county funds, so the source of Plaintiff's paychecks does not show that Plaintiff's employer was the County and not the TCO.  *E.g.*, O.C.G.A. § 48-5-183 (tax commissioner salaries are paid out of county funds).  For all of these reasons, the Court finds that Plaintiff has not submitted evidence sufficient for a reasonable jury to conclude that Plaintiff was an employee of the County, not the TCO.

Plaintiff's claims against the County are all essentially premised on a theory of employer liability.  Because the County was not Plaintiff's employer and because Plaintiff has not pointed to any other theories under which the County can be held liable for Plaintiff's termination from the TCO, the County is entitled to summary judgment.  The only claims remaining for further analysis are Plaintiff's claims against Watson in her official and individual capacities.

### III. Plaintiff's Employment and Termination

During the time frame relevant to this action, the TCO had four employees, plus Watson.  The four TCO clerks worked in close proximity to one another in a single room (28 feet by 12 feet).  Each TCO clerk had a work station at a single, long desk where taxpayers could come to transact their business.  Though there was a credenza between each work station, there were no partitions in the open office.  Watson had a private office looking out upon the room where the TCO clerks worked, but she often spent at least half of her time in the same room as the TCO clerks, working alongside them.  (*E.g.* Pl.'s Dep. 15:15-16.)  As a TCO clerk, Plaintiff's job duties included answering taxpayer questions in person and on the telephone, collecting certain taxes, servicing tax returns, and running reports.  Plaintiff performed these functions based on Watson's policies.  Plaintiff does not seriously dispute that the nature of the TCO—the close quarters of the office and the frequent interaction with members of the public—required closeness and cooperation among the TCO clerks and Watson.  She also does not dispute that Plaintiff and Watson were required to communicate frequently regarding office matters.  Furthermore, Plaintiff and the other clerks were the "face" of the TCO; if a TCO clerk was disrespectful or rude to a member of the public, that would reflect poorly on Watson.  (*E.g.*, Pl.'s Dep. 45:6-10.)

8

It is undisputed that Plaintiff served as a clerk in the TCO for more than twenty years and that she had a great deal of institutional knowledge.  Watson contends that Plaintiff was "basically in charge" while Watson was out of the office and that Plaintiff had more responsibilities than other employees.  Plaintiff admits that she was very knowledgeable about the workings of the TCO, but she denies having any decision-making authority or having more responsibilities than other employees.  (*E.g.*, Pl.'s Aff. ¶ 3; Pl.'s Dep. 46:20-47:21.)  It is undisputed that at some point during her tenure in the office Plaintiff was offered a promotion to deputy tax commissioner, which she declined.

Although Watson regarded Plaintiff as a good worker with a great deal of institutional knowledge, she and the other TCO clerks also considered Plaintiff to be blunt, abrupt, and short with people.  (*E.g.*, Hitchcock Dep. 29:24, 30:4-5, Apr. 6, 2008; Jordan Dep. 32:2-5, Mar. 13, 2008; Stamps Dep. 80:12-15, Feb. 21, 2008.)  According to Watson, her relationship with Plaintiff began to sour in 2003 and then took a serious downturn in 2004 after Kathy Stamps, another TCO clerk, announced that she planned to run against Watson for Tax Commissioner.  After Stamps announced her candidacy in April 2004, Watson allowed Stamps to continue working as a clerk in the TCO.  The office became very tense, and the social conversation in the office declined over the campaign season until there was virtually none.  During this time, there was tension not only between Stamps and

9

Watson but also between Plaintiff and Watson.  (*E.g.*, Jordan Dep. 31:19-24.)  According to Watson, Plaintiff stopped speaking to Watson unless it was necessary to do so.  According to Plaintiff, however, Plaintiff did not change her behavior toward Watson or anyone else during the campaign.  Watson never spoke with Plaintiff or counseled her on these issues.  (Pl.'s Aff. ¶ 19.)

Although the other TCO clerks knew that Plaintiff supported Stamps's campaign (*e.g.*, Jordan Dep. 27:8-15), Plaintiff did not openly express support of Stamps in the office.  She did, however, have a Stamps campaign sign in her yard, although it is disputed that Watson was personally aware of the sign.  Moreover, Watson testified that she "had feelings" that Plaintiff was supporting Stamps in the election.  (Watson Dep. 164:5-7, Feb. 21, 2008.)  The Court finds that sufficient evidence exists from which a reasonable jury could conclude that Watson knew that Plaintiff was supporting her opponent.[4]

As the campaign season progressed, Watson perceived that Plaintiff was becoming more distant toward her and less responsive to the public.  (*E.g.*, Watson Aff. ¶¶ 20-23, June 9, 2008 [hereinafter Watson Aff. I].)  The tension in the office was palpable to the TCO employees and to the public.  Watson attributes some of this tension to Plaintiff, but Plaintiff asserts that the tension was due to the fact that Watson's opponent was employed in the office.  In the days

---

[4]At the hearing on Defendant's motion, Defendant's counsel did not seriously dispute this conclusion.

before the election, Watson received complaints from taxpayers that Plaintiff was rude to them or refused to help them. (*E.g.*, Dove Aff. ¶¶ 3-4, June 6, 2008. *But see* Haggard Aff. ¶ 3, June 6, 2008 (suggesting that Plaintiff's rudeness dates back to at least 2001 and was not a new phenomenon in 2004).)   Plaintiff denies these allegations.   Again, Watson never spoke with Plaintiff or counseled her about these issues. (Pl.'s Aff. ¶ 19.)

Watson was reelected.   The day after the election, Watson terminated Plaintiff.[5]   Although Watson told Plaintiff she had done a "good job" at completing her work tasks, Watson was concerned that Plaintiff had been disrespectful to members of the public and to Watson.   In addition, Watson perceived that Plaintiff contributed to creating tension that disrupted the office, making it difficult to maintain the closeness and cooperation within the TCO required to keep the office running efficiently.

Plaintiff sought to appeal her termination via the process outlined in the County's personnel policy.   Connie Benge, the Madison County personnel coordinator, responded to Plaintiff's letter of appeal and informed Plaintiff that "being an employee of the Tax Commissioner" Plaintiff did not "have the Right of Appeal as outlined in the Board of Commissioner[s'] Personnel Policy." (Ex. 1 to Watson Dep.)

---

[5]Watson also terminated Stamps because she believed Stamps's behavior in the office during the campaign was out of bounds and insubordinate. (Watson Aff. ¶ 22.)

Plaintiff was 56 when she was terminated.  Watson hired Mary Dowell, age 53, to replace Plaintiff.  (Watson Aff. I ¶ 24.)

## IV.  Plaintiff's Claims

Plaintiff makes First Amendment freedom of association claims against Watson,[6] contending that Watson fired her for supporting Stamps during the election.  Plaintiff also makes a procedural due process claim, contending that Watson denied Plaintiff a pre- or post-termination hearing as Plaintiff requested.  Finally, Plaintiff makes age discrimination claims under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*

DISCUSSION

## I.  Plaintiff's First Amendment Claims

### A.  Official Capacity Claim Against Watson

Plaintiff contends that Watson fired her because Plaintiff supported Stamps during the 2004 campaign.  The Court finds that this case is best construed as a pure political patronage case because Plaintiff contends that her employment was conditioned on political allegiance to Watson and not upon the content of her expressions of political beliefs.  *Epps v. Watson,* 492 F.3d 1240, 1244 n.3 (11th Cir. 2007) ("[T]his case is best construed as a pure political patronage case.") (citing *Terry v. Cook*, 866 F.2d 373, 377 (11th Cir.

---

[6]Plaintiff sued Watson in her official and individual capacities. The official capacity claims are considered claims against the TCO.  *See Smith v. Allen*, 502 F.3d 1255, 1272-73 (11th Cir. 2007) (official capacity suit is another way of pleading an action against the entity of which an officer is an agent).

12

1989) (distinguishing political patronage cases from political expression cases)); *see Elrod v. Burns*, 427 U.S. 347, 367, 373 (1976) (finding patronage dismissals unconstitutional unless position required political affiliation to elected official); *see also Branti v. Finkel*, 445 U.S. 507, 518 (1980) (same).

To prevail upon her claim, Plaintiff must first show that political loyalty was not an appropriate requirement for her employment in the TCO. *Terry*, 866 F.2d at 377. If she makes this showing, Plaintiff must then show that (1) she engaged in constitutionally protected conduct and (2) the protected conduct was a substantial or motivating factor in Watson's decision to terminate her. *E.g., Cutcliffe v. Cochran*, 117 F.3d 1353, 1355 (11th Cir. 1997); *Gordon v. Cochran*, 116 F.3d 1438, 1441 n.4 (11th Cir. 1997); *see also, e.g., Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977) (outlining mixed motive analysis, under which an employer can still prevail if it shows that it would have made the same employment decision even in the absence of the protected conduct).

At the hearing on Defendant's Motion for Summary Judgment, counsel for the Defendants did not dispute that Plaintiff has pointed to sufficient evidence to create a genuine issue of material fact as to whether Plaintiff engaged in protected activity and whether Watson fired her because of the protected activity. The Court concurs that genuine issues of material fact exist as to whether Plaintiff was

terminated because she supported Watson's opponent.  It became clear at the hearing that the thrust of Defendants' summary judgment argument is that Watson had the absolute right to fire Plaintiff because of that support.  Defendants argue that such conduct does not violate Plaintiff's First Amendment rights because political loyalty was an appropriate job requirement for the position that Plaintiff held.

Defendants are correct that under certain circumstances political loyalty may be an appropriate job requirement and that firing an employee who violates that loyalty does not always violate the First Amendment.  The question presented by Defendants' Motion for Summary Judgment is whether political loyalty was an appropriate requirement for Plaintiff's position.  Political loyalty is generally found to be an appropriate job requirement if the employee of an official is the official's "alter ego" and "general agent" such that "closeness and cooperation" between the employee and the official necessitates the official's absolute authority over the employee's "appointment and/or retention."  *Terry*, 866 F.2d at 377; *see also Gordon*, 116 F.3d at 1440 (noting that political loyalty is an appropriate job requirement of an employee who acts as the official spokesperson for the official).  However, where a job "traditionally revolve[s] around limited objectives and defined duties" and does not require the employee to be an "alter ego" of the official, political loyalty is not generally an appropriate job requirement.  *Terry*, 866

14

F.2d at 378; *see also Gordon*, 116 F.3d at 1440-41 (noting that job involving "entirely administrative and clearly defined functions" should not require political affiliation). This inquiry depends upon "the actual responsibilities" of the employee's job and the relationship of the employee to the official. *Terry*, 866 F.2d at 378.

Here, Plaintiff has pointed the Court to evidence that her job involved limited objectives and duties defined by Watson. Although Defendants characterize Plaintiff as Watson's second in command, the present record certainly does not demand that conclusion. A jury could reasonably conclude that Plaintiff was simply a long-term employee of the TCO with no decision-making authority and no more responsibility than any other employee. (*E.g.*, Pl.'s Aff. ¶ 3; Pl.'s Dep. 46:20-47:21.) Furthermore, while Defendants point to evidence that TCO clerks were the "face" of the TCO and that the clerks frequently interacted with members of the public on behalf of the TCO, a reasonable jury could conclude from the evidence that the TCO clerks, including Plaintiff, were required to follow Watson's defined policies, that their duties were administrative and not policy-making, and that they were not Watson's "alter ego." Therefore, the Court cannot conclude as a matter of law that political loyalty to Watson was an appropriate job requirement for working in the TCO. This conclusion is supported by Watson's own testimony. (Defs.' Br. in Supp. of Mot. for Summ. J. 20 ("Louise Watson has testified that

15

political loyalty is not a requirement for working at the TCO.").)
Since genuine issues of material fact exist as to whether Plaintiff's
job duties were such that Plaintiff owed political loyalty to Watson,
summary judgment is not appropriate in favor of Watson in her
official capacity on Plaintiff's First Amendment claim.

B.    Individual Capacity Claim Against Watson

As to Plaintiff's First Amendment claim against Watson in her
individual capacity, Watson argues that she is entitled to qualified
immunity.  Qualified immunity shields public officers acting within
the scope of their discretionary authority from liability so long as
their acts do not violate clearly established law.  *Hope v. Pelzer*,
536 U.S. 730, 739 (2002).  It is undisputed that Watson was engaged
in a discretionary function when she terminated Plaintiff.
Therefore, the Court must determine (1) whether Plaintiff has pointed
to sufficient evidence to show that Watson deprived her of a
constitutional right; and (2) whether that right was clearly
established at the time of the violation.  *See Saucier v. Katz*, 533
U.S. 194, 201 (2001).

The protection of qualified immunity is only warranted at the
summary judgment stage if "there is no genuine issue of material fact
preventing [the defendant] from being entitled to qualified
immunity." *Johnson v. Breeden*, 280 F.3d 1308, 1317 (11th Cir. 2002).
"[I]f the evidence at the summary judgment stage, viewed in the light
most favorable to the plaintiff, shows there are facts that are

16

inconsistent with qualified immunity being granted, the case and the qualified immunity issue along with it will proceed to trial."  *Id.*

As discussed above, genuine issues of material fact exist as to whether (1) political affiliation was an appropriate job requirement for working in the TCO, (2) Plaintiff engaged in protected activity, and (3) Watson fired Plaintiff because of the protected activity. Therefore, for summary judgment purposes, Plaintiff has pointed to sufficient evidence that she was deprived of a constitutional right.

The next question is whether the right was clearly established at the time of the violation.  "'Clearly established law' is law that is sufficiently defined so as to provide public officials with 'fair notice' that the conduct alleged is prohibited."  *Epps*, 492 F.3d at 1245 (citing *Hope*, 536 U.S. at 739).  The Eleventh Circuit has concluded that Watson had fair notice when she fired Plaintiff that a clerk with a "limited and defined role" need not have political loyalty to the Tax Commissioner.  *Id.* at 1245-46.  The Eleventh Circuit therefore concluded that terminating such a clerk because of her political affiliation would be a violation of clearly established law.  *Id.* at 1246.  As discussed above, there is a genuine issue of material fact as to whether Plaintiff was simply a clerk with a "limited and defined role" or whether Plaintiff was really Watson's second in command with more decision-making authority and responsibilities than other TCO employees.  This disputed fact issue must be resolved before the Court can determine whether Plaintiff's

termination violated clearly established law, so the Court cannot determine at this time whether Watson is entitled to qualified immunity.  Therefore, Watson is not entitled to summary judgment based on qualified immunity, and the qualified immunity issue must proceed along with the case to trial.

## II.  Plaintiff's Procedural Due Process Claim

The Fourteenth Amendment protects against the government's deprivation of property without procedural due process.  Plaintiff contends that her due process rights were violated when she did not receive a hearing upon her termination from the TCO.  To establish her procedural due process claim, Plaintiff must show that she had a protected property interest in her employment.  *Epps*, 492 F.3d at 1246 (citing *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 571 (1972)).  "'State law determines whether a public employee has a property interest in his or her job.'"  *Id.* (quoting *Warren v. Crawford*, 927 F.2d 559, 562 (11th Cir. 1991)).  "'Under Georgia law, a public employee generally has no protected property interest unless he or she is employed under a civil service system, which allows termination only for cause.'"  *Id.* (quoting *Brett v. Jefferson County, Ga.*, 123 F.3d 1429, 1433-34 (11th Cir. 1997)).

Plaintiff contends that she was covered by the Madison County personnel policy, which provides that county employees may be terminated only for cause and that county employees are entitled to a hearing prior to termination.  As discussed above, Plaintiff was

not a Madison County employee.  However, the TCO did adopt certain portions of Madison County's personnel policy.  (*See* Attach. 1 to Watson Aff. I, Personnel Policy of the Office of the Tax Commissioner of Madison County, Aug. 1, 2002 [hereinafter TCO Personnel Policy].) The preliminary issue that must be resolved is whether sufficient evidence exists from which a reasonable jury could conclude that the TCO adopted the due process provisions of the County Personnel Policy that required a termination hearing.  Watson has presented evidence that the TCO's "adoption [of the county personnel policies] does not subject employees of the [TCO] to coverage under the Madison County personnel system." (*Id.*)  She points to the uncontroverted fact that when the TCO adopted certain county policies, it was clearly stated that "employees of the [TCO] have no right of expectation of continued employment nor any type of property interest in their employment, and no employee of the [TCO] is entitled to any sort of grievance procedure, termination hearing, or other type of procedural due process in connection therewith."  (*Id.*)

Plaintiff does not dispute that when the TCO first adopted certain county policies the TCO expressly excluded those polices relating to due process rights.  However, Plaintiff maintains that when she received a Madison County personnel policy booklet in 2004, that booklet included all of the county employee policies, including those regarding due process rights.  Plaintiff further contends that Watson did not tell her at that time that only certain portions of

the policy applied to employees in the TCO.  Thus, Plaintiff argues,
that evidence exists from which a reasonable jury could conclude that
Watson adopted the 2004 Madison County policy in its entirety,
including the provisions regarding due process rights.  Plaintiff
conveniently disregards the fact that when the county policies were
first adopted by the TCO that the TCO specifically stated that "[a]ny
subsequent changes to the Madison County Board of Commissioners
Personnel Policy are not applicable to personnel of the [TCO] unless
specifically adopted, in writing, by the Commissioner."  (TCO
Personnel Policy.)

Based on the foregoing, the Court finds as a matter of law that
the applicable personnel policies for the TCO were those policies
adopted in 2002 that specifically excluded due process rights.  The
Court further finds that the county booklet provided to Plaintiff in
2004 does not amend the 2002 policy since there is no evidence that
the due process provisions in the booklet were ever specifically
adopted in writing by the Commissioner.  Accordingly, the TCO
Personnel Policy does not provide Plaintiff with a protected property
interest in continued employment with the TCO or a right to a
termination hearing.

Plaintiff also contends that under certain circumstances Georgia
law requires tax commissioners and employees in their offices to be
subject to a "merit system of personnel administration, as
promulgated by each [tax commissioner's office], under which such

20

[tax commissioners] and employees shall perform services on the basis of merit, fitness, and efficiency." O.C.G.A. § 47-2-292(a). Plaintiff contends that this statute mandates that employees of the Madison County TCO be subject to a merit system under which they are entitled to a hearing prior to termination.[7] However, the statute contains no such requirement, and Plaintiff has not pointed the Court to any evidence that the TCO of Madison County promulgated a merit system that required a hearing prior to termination for cause.[8] Accordingly, the Court finds that Plaintiff was not entitled to a hearing prior to her termination and that Plaintiff did not have a protected property interest in continued employment with the TCO. Thus, her procedural due process claim fails.[9]

## III. Plaintiff's ADEA Claim

The ADEA protects individuals who are at least 40 years of age from age discrimination in employment. 29 U.S.C. § 631(a). However, the ADEA only applies to employers with twenty or more employees. 29 U.S.C. § 630(b). It is undisputed that the TCO had only four

---

[7]According to Watson, hiring, pay and promotions in the TCO are done on the basis of merit. (Watson Aff. ¶ 2, July 21, 2008.)

[8]Plaintiff appears to argue that because the Madison County TCO has not promulgated such a merit system of personnel employment, the Court should find that the TCO adopted Madison County's personnel policy. This argument fails because Plaintiff has not rebutted evidence that the TCO specifically did *not* adopt Madison County's personnel policy. (TCO Personnel Policy.)

[9]Because the Court finds no constitutional violation with regard to Plaintiff's procedural due process claims, Watson is entitled to qualified immunity as to the individual capacity due process claims against her. *See Saucier*, 533 U.S. at 201.

employees and thus does not have the requisite number of employees to be considered an "employer" under the ADEA.  Thus, Watson is entitled to summary judgment on any ADEA claims Plaintiff makes against her.[10]

CONCLUSION

As discussed above, Watson's Motion to Strike (Doc. 73) is granted.  Defendants' Motion for Summary Judgment (Doc. 55) is granted as to all of Plaintiff's claims against the County, as well as Plaintiff's procedural due process and ADEA claims against Watson. Summary judgment is denied as to Plaintiff's First Amendment claims against Watson.

IT IS SO ORDERED, this 30th day of October, 2008.


S/Clay D. Land
                        CLAY D. LAND
UNITED STATES DISTRICT JUDGE

_____

[10]Plaintiff contends that she was an employee of the County, not the TCO, and that the County has the requisite number of employees to be considered an "employer" for purposes of the ADEA.  As discussed above, no reasonable juror could conclude that Plaintiff was employed by the County instead of the TCO.